**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALTERA CORPORATION & SUBSIDIARIES, *Petitioner-Appellee*, v. COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellant.* | Nos. 16-70496 16-70497 Tax Ct. Nos. 6253-12 9963-12 OPINION |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted October 11, 2017
San Francisco, California

Filed July 24, 2018

Before: Sidney R. Thomas, Chief Judge, and Stephen
Reinhardt* and Kathleen M. O'Malley** Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge O'Malley

---

* Judge Reinhardt fully participated in this case and formally concurred in the majority opinion prior to his death.

** The Honorable Kathleen M. O'Malley, United States Circuit Judge for the U.S. Court of Appeals for the Federal Circuit, sitting by designation.

## SUMMARY[***]

### Tax

The panel reversed a decision of the Tax Court that 26 C.F.R. § 1.482-7A(d)(2), under which related entities must share the cost of employee stock compensation in order for their cost-sharing arrangements to be classified as qualified cost-sharing arrangements and thus avoid an IRS adjustment, was invalid under the Administrative Procedure Act.   The panel reasoned that the Commissioner of Internal Revenue did not exceed the authority delegated to him by Congress under 26 U.S.C. § 482, that the Commissioner's rule-making authority complied with the Administrative Procedure Act, and that therefore the regulation is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Dissenting, Judge O'Malley would find, as the Tax Court did, that 26 C.F.R. § 1.482-7A(d)(2) is invalid as arbitrary and capricious.

## COUNSEL

Arthur T. Catterall (argued), Richard Farber, and Gilbert S. Rothenberg, Attorneys; Diana L. Erbsen, Deputy Assistant Attorney General; Caroline D. Ciraolo, Acting Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Respondent-Appellant.

---

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Donald M. Falk (argued), Mayer Brown LLP, Palo Alto, California; Thomas Kittle-Kamp and William G. McGarrity, Mayer Brown LLP, Chicago, Illinois; Brian D. Netter and Travis Crum, Mayer Brown LLP, Washington, D.C.; A. Duane Webber, Phillip J. Taylor, and Joseph B. Judkins, Baker & McKenzie LLP, Washington, D.C.; for Petitioner-Appellee.

Susan C. Morse, University of Texas School of Law, Austin, Texas; Stephen E. Shay, Harvard Law School, Cambridge, Massachusetts; for Amici Curiae J. Richard Harvey, Leandra Lederman, Ruth Mason, Susan Morse, Stephen Shay, and Bret Wells.

Jonathan E. Taylor, Gupta Wessler PLLC, Washington, D.C.; Clint Wallace, Vanderbilt Hall, New York, New York; for Amici Curiae Anne Alstott, Reuven Avi-Yonah, Lily Batchelder, Joshua Blank, Noel Cunningham, Victor Fleischer, Ari Glogower, David Kamin, Mitchell Kane, Sally Katzen, Edward Kleinbard, Michael Knoll, Rebecca Kysar, Zachary Liscow, Daniel Shaviro, John Steines, David Super, Clint Wallace, and George Yin.

Larissa B. Neumann, Ronald B. Schrotenboer, and Kenneth B. Clark, Fenwick & West LLP, Mountain View, California, for Amicus Curiae Xilinx Inc.

Christopher J. Walker, The Ohio State University Moritz College of Law, Columbus, Ohio; Kate Comerford Todd, Steven P. Lehotsky, and Warren Postman, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

John I. Forry, San Diego, California, for Amicus Curiae TechNet.

Alice E. Loughran, Michael C. Durst, and Charles G. Cole, Steptoe & Johnson LLP, Washington, D.C.; Bennett Evan Cooper, Steptoe & Johnson LLP, Phoenix, Arizona; for Amici Curiae Software and Information Industry Association, Financial Executives International, Information Technology Industry Council, Silicon Valley Tax Directors Group, Software Finance and Tax Executives Counsel, National Association of Manufacturers, American Chemistry Council, BSA | the Software Alliance, National Foreign Trade Council, Biotechnology Innovation Organization, Computing Technology Industry Association, The Tax Council, United States Council for International Business, Semiconductor Industry Association.

Kenneth P. Herzinger and Eric C. Wall, Orrick Herrington & Sutcliffe LLP, San Francisco, California; Peter J. Connors, Orrick Herrington & Sutcliffe LLP, New York, New York; for Amici Curiae Charles W. Calomiris, Kevin H. Hassett, and Sanjay Unni.

Roderick K. Donnelly and Neal A. Gordon, Morgan Lewis & Bockius LLP, Palo Alto, California; Thomas M. Peterson, Morgan Lewis & Bockius LLP, San Francisco, California; for Amicus Curiae Cisco Systems Inc.

Christopher Bowers, David Foster, Raj Madan, and Royce Tidwell, Skadden Arps Slate Meagher & Flom LLP, Washington, D.C.; Nathaniel Carden, Skadden Arps Slate Meagher & Flom LLP, Chicago, Illinois; for Amicus Curiae Amazon.com Inc.

## OPINION

THOMAS, Chief Judge:

In this case, we consider the validity of 26 C.F.R. § 1.482-7A(d)(2),[1] under which related entities must share the cost of employee stock compensation in order for their cost-sharing arrangements to be classified as qualified cost-sharing arrangements ("QCSA") and thus avoid an IRS adjustment. We conclude that the regulations withstand scrutiny under general administrative law principles, and we therefore reverse the decision of the Tax Court.

I

Corporations often elect to conduct business through international subsidiaries. Transactions between related companies can provide opportunities for minimizing or avoiding taxes, particularly when a foreign subsidiary is located in a low tax jurisdiction. For example, a parent company in a high tax jurisdiction can sell property to its subsidiary in a low tax jurisdiction and have its subsidiary sell the property for profit. The profits from those sales are thus taxed in a lower tax jurisdiction, resulting in significant tax savings for the parent. This practice, known as "transfer pricing" can result in United States companies shifting profits that would be subject to tax in America offshore to avoid tax. Similarly, related companies can identify and shift costs

---

[1] The 2003 amendments to Treasury's cost-sharing regulations are at issue. Although they are still in effect, the Code has been reorganized, and what was § 1.482-7 in 2003 is now numbered § 1.482-7A. To minimize confusion, our citations are to the current version of the regulations unless otherwise specified.

between American and foreign jurisdictions to minimize tax exposure. In recent years, United States corporations have used these techniques to develop intangible property with their foreign subsidiaries, and to share the cost of development between the companies. Under these arrangements, a U.S. corporation might enter into a research and development ("R&D") cost-sharing agreement with its foreign subsidiary located in a low tax jurisdiction and grant the offshore company rights to exploit the property internationally. The interplay of cost and income allocation between the two companies in such a transaction can result in significantly reduced taxes for the United States parent.

To address the risk of multinational corporation tax avoidance, Congress passed legislation granting the United States Department of the Treasury the authority to allocate income and costs between such related parties. 26 U.S.C. § 482. In turn, the Secretary of the Treasury promulgated regulations authorizing the Commissioner of the Internal Revenue Service to allocate income and costs among these related entities. 26 C.F.R. §§ 1.482-0 through 1.482-9.

At issue before us are employee stock options, the cost of which the companies in this case elected not to share, resulting in substantial tax savings for the parent—here, the tax associated with over $80 million in income. The Commissioner contends that allocation of stock compensation costs between the companies is appropriate to reflect economic reality; Altera Corporation ("Altera") and its subsidiaries contend that any cost allocation exceeds the Commissioner's authority.

Fundamental to resolution of this dispute is an understanding of the arm's length standard, a tool that

Treasury developed in the mid-twentieth century to ensure that controlled taxpayers were taxed similarly to uncontrolled taxpayers. The arm's length standard is results-oriented, meaning that its goal is parity in taxable income rather than parity in the method of allocation itself. 26 C.F.R. § 1.482-1(b)(1) ("A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)."). A traditional arm's length analysis looks to comparable transactions among non-related parties to achieve an arm's length result. The issue in this case is whether Treasury can permissibly allocate between related parties a cost that unrelated parties do not agree to share.

Altera asserts that the arm's length standard always demands a comparability analysis, meaning that the Commissioner cannot allocate costs between related parties in the absence of evidence that unrelated parties share the same costs when dealing at arm's length. Altera argues that, because uncontrolled taxpayers do not share the cost of employee stock options, the Commissioner cannot require related parties to share that cost.

The Commissioner argues that he may, consistent with the arm's length standard, apply a purely internal method of allocation, distributing the costs of employee stock options in proportion to the income enjoyed by each controlled taxpayer. This "commensurate with income" method analyzes the income generated by intangible property in comparison with the amount paid (usually as royalty) to the parent. In the Commissioner's view, the commensurate with income method is consistent with the arm's length standard

because controlled cost-sharing arrangements have no equivalent in uncontrolled arrangements, and Congress has provided that the Commissioner may dispense with a comparability analysis where comparable transactions do not exist in order to achieve an arm's length result.

Because this case involves a challenge to regulations, the ultimate issue is not what the arm's length standard should mean but rather whether Treasury may define the standard as it has. We conclude that the challenged regulations are not arbitrary and capricious but rather a reasonable execution of the authority delegated by Congress to Treasury.

II

At issue is Altera's tax liability for the years 2004 through 2007. During the relevant period, Altera and its subsidiaries designed, manufactured, marketed, and sold programmable logic devices, electronic components that are used to build circuits.

In May of 1997, Altera entered into a cost-sharing agreement with one of its subsidiaries, Altera International, Inc., a Cayman Islands corporation ("Altera International"), which had been incorporated earlier that year. Altera granted to Altera International a license to use and exploit Altera's preexisting intangible property everywhere in the world except the United States and Canada. In exchange, Altera International paid royalties to Altera. The parties agreed to pool their resources to share R&D costs in proportion to the benefits anticipated from new technologies.

Altera and the IRS agreed to an Advance Pricing Agreement covering the 1997–2003 tax years. Pursuant to

this agreement, and consistent with the cost-sharing regulations in effect at the time, Altera shared with Altera International stock-based compensation costs as part of the shared R&D costs. The Treasury regulations were amended in 2003, and Altera and Altera International amended their cost-sharing agreement to comply with the modified regulations, continuing to share employee stock compensation costs.

The agreement was amended again in 2005 following the Tax Court's opinion in *Xilinx, Inc. v. Commissioner*, involving a challenge to the allocation of employee stock compensation costs under the 1994–1995 cost-sharing regulations. 125 T.C. 37 (2005). The parties agreed to "suspend the payment of any portion of [a] Cost Share . . . to the extent such payment relates to the Inclusion of Stock-Based Compensation in R&D Costs" unless and until a court upheld the validity of the 2003 cost-sharing regulations. The following provision explains Altera's reasoning:

> The Parties believe that it is more likely than not that (i) the Tax Court's conclusion in *Xilinx v. Commissioner*, 125 T.C. [No.] 4 (2005), that the arm's length standard controls the determination of costs to be shared by controlled participants in a qualified cost sharing arrangement should also apply to Treas. Reg. § 1.482-7[A](d)(2) (as amended by T.D. 9088), and (ii) the Parties' inclusion of Stock-Based Compensation in R&D Costs pursuant to Amendment I would be contrary to the arm's length standard.

Altera and its U.S. subsidiaries did not account for R&D-related stock-based compensation costs on their consolidated 2004–2007 federal income tax returns.  The IRS issued two notices of deficiency to the group, applying § 1.482-7(d)(2) to increase the group's income by the following amounts:

| | |
|---|---|
| 2004 | $ 24,549,315 |
| 2005 | $ 23,015,453 |
| 2006 | $ 17,365,388 |
| 2007 | $ 15,463,565 |

The Altera group timely filed petitions in the Tax Court. The parties filed cross-motions for partial summary judgment, and the Tax Court granted Altera's motion. Sitting en banc, the court held that § 1.482-7A(d)(2) is invalid under the Administrative Procedure Act ("APA").  *Altera Corp. & Subsidiaries v. Comm'r*, 145 T.C. 91 (2015).

The Tax Court unanimously determined that the Commissioner's allocation of income and expenses between related entities must be consistent with the arm's length standard, and that the arm's length standard is not met unless the Commissioner's allocation can be compared to an actual transaction between unrelated entities.  The court reasoned that the Commissioner could not require related parties to share stock compensation costs because the Commissioner had not considered any unrelated party transactions in which the parties shared such costs.  The court concluded that the agency decision-making process was fundamentally flawed because: (1) it rested on speculation rather than hard data and expert opinions; and (2) it failed to respond to significant public comments, particularly those identifying uncontrolled

cost-sharing arrangements in which the entities did not share stock compensation costs. *Altera*, 145 T.C. at 122–31.

The Tax Court's decision rested largely on its own opinion in *Xilinx*, in which it held that "the arm's-length standard always requires an analysis of what unrelated entities do under comparable circumstances." *Id.* at 118 (citing *Xilinx*, 125 T.C. at 53–55). In its decision in this case, the Tax Court reinforced its conclusion that the Commissioner cannot require related entities to share stock compensation costs unless and until it locates uncontrolled transactions in which these costs are shared. *Id.* at 118–19.

The court reached five holdings: (1) that the 2003 amendments constitute a final legislative rule subject to the requirements of the APA; (2) that *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29 (1983) provides the appropriate standard of review because the standard set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), incorporates *State Farm*'s reasoned decisionmaking standard; (3) that Treasury failed to adequately support its decision to allocate the costs of employee stock compensation between related parties; (4) that Treasury's failure was not harmless error; and (5) that § 1.482-7A(d)(2) is invalid under the APA. *Id.* at 115–33.

On appeal, the Commissioner does not dispute the first holding regarding the applicability of *State Farm*, although he argues that the appropriate standard is more deferential and less empirically minded than the standard actually applied by the Tax Court. Nor does he claim that any error in the decisionmaking process, if it existed, was harmless. The challenged holdings—(2), (3), and (5)—are all part of the

same broader question: did Treasury exceed its authority in requiring Altera's cost-sharing arrangement to include a particular distribution of employee stock compensation costs?

### III

The Commissioner's position is founded on 26 U.S.C. § 482. Because an understanding of § 482 and its history is integral to resolution of each of the issues raised by the parties, a brief overview of the statute and its history is important.

At the relevant time,[2] 26 U.S.C. § 482 appeared to provide a nearly limitless grant of authority to Treasury to allocate income between related parties:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated)

---

[2] Section 482 was amended in December 2017 to include a third sentence:

> For purposes of this section, the Secretary shall require the valuation of transfers of intangible property (including intangible property transferred with other property or services) on an aggregate basis or the valuation of such a transfer on the basis of the realistic alternatives to such a transfer, if the Secretary determines that such basis is the most reliable means of valuation of such transfers.

Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054. Because the amendment postdates the operative regulations, it does not affect our analysis.

owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

The first sentence has remained substantively unchanged since 1928, Revenue Act of 1928, ch. 852, § 45, 45 Stat. 791, 806 (1928), and it provides the statutory authority for the arm's length standard, which first appeared in the 1934 tax regulations, Regulations 86, Art. 45-1(b) (1935). The second sentence sets forth the commensurate with income standard, and it was added to the statute in 1986. Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2562 (1986).

A

From the beginning, § 482's precursor was designed to give Treasury the flexibility it needed to prevent cost and income shifting between related entities for the purpose of decreasing tax liability. *See* H.R. REP. NO. 70-2, at 16–17 (1927) ("[T]he Commissioner may, in the case of two or more trades or businesses owned or controlled by the same

interests, apportion, allocate, or distribute the income or deductions between or among them, as may be necessary in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking'), and in order clearly to reflect their true tax liability."); *accord* S. REP. NO. 70-960, at 24 (1928).   The purpose of the statute is "to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer . . . ." *Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972) (quoting Treas. Reg. § 1.482-1(b)(1) (1971)). This parity is double-edged: as much as § 482 works to ensure controlled taxpayers are not overtaxed, the concern expressed on the face of § 482, even before the 1986 amendment, is preventing tax avoidance by controlled taxpayers.

After 1934, when the arm's length standard appeared in the regulations—in what is essentially its modern form— courts did not hold related parties to the standard by looking for comparable transactions.   For example, in *Seminole Flavor Co. v. Commissioner*, the Tax Court rejected a strict application of the arm's length standard in favor of an inquiry into whether the allocation of income between related parties was "fair and reasonable."   4 T.C. 1215, 1232 (1945); *see also id.* at 1233 ("Whether any such business agreement would have been entered into by petitioner with total strangers is wholly problematical."); *Grenada Indus., Inc. v. Comm'r*, 17 T.C. 231, 260 (1951) ("We approve an allocation . . . to the extent that such gross income in fact exceeded the fair value of services rendered . . . .").   And in 1962, this Court collected various allocation standards and outright rejected the superiority of the arm's length standard over all others:

[W]e do not agree . . . that "arm's length bargaining" is the sole criterion for applying the statutory language of § 45 in determining what the "true net income" is of each "controlled taxpayer." Many decisions have been reached under § 45 without reference to the phrase "arm's length bargaining" and without reference to Treasury Department Regulations and Rulings which state that the talismanic combination of words—"arm's length"—is the "standard to be applied in every case."

For example, it was not any less proper . . . to use here the "reasonable return" standard than it was for other courts to use "full fair value," "fair price including a reasonable profit," "method which seems not unreasonable," "fair consideration which reflects arm's length dealing," "fair and reasonable," "fair and reasonable" or "fair and fairly arrived at," or "judged as to fairness," all used in interpreting § 45.

*Frank v. Int'l Canadian Corp.*, 308 F.2d 520, 528–29 (9th Cir. 1962) (footnotes omitted).[3]

In the 1960s, the problem of abusive transfer pricing practices created a new adherence to a stricter arm's length

---

[3] The Court later took a hard turn from the flexibility it welcomed in *Frank*, which it limited to situations in which "it would have been difficult for the court to hypothesize an arm's-length transaction." *Oil Base, Inc. v. Comm'r*, 362 F.2d 212, 214 n.5 (9th Cir. 1966)

standard.  In response to concerns about the undertaxation of multinationals, Congress considered reworking the Code to resolve the difficulty posed by the application of the arm's length standard to related party transactions.  H.R. REP. No. 87-1447, at 28–29 (1962).    However, it instead asked Treasury to "explore the possibility of developing and promulgating regulations . . . which would provide additional guidelines and formulas for the allocation of income and deductions" under § 482.  H.R. CONF. REP. NO. 87-2508, at 19 (1962), *reprinted in* 1962 U.S.C.C.A.N. 3732, 3739. Legislators believed that § 482, at least in theory, authorized the Secretary to employ a profit-split allocation method without amendment.  *Id.*; H.R. REP. No. 87-1447, at 28–29 ("This provision appears to give the Secretary the necessary authority to allocate income between a domestic parent and its foreign subsidiary.").

In 1968, following Congress's entreaty, Treasury finalized the first regulation tailored to the issue of intangible property development in cost-sharing arrangements.  Treas. Reg. § 1.482-2(d) (1968).    The novelty of the 1968 regulations was their focus on comparability.  *Compare* Treas. Reg. § 1.482-2(d)(2) ("An arm's length consideration shall be in a form which is consistent with the form which would be adopted in transactions between unrelated parties in the same circumstances.") *with* Regulations 86, Art. 45-1(b) (1935) (focusing on arm's length results rather than arm's length form).  The 1968 regulations "constituted a radical and unprecedented approach to the problem they addressed— notwithstanding their being couched in terms of the 'arm's length standard,' and notwithstanding that that standard had been the nominal standard under the regulations for some 30 years . . . ."  Stanley I. Langbein, *The Unitary Method and the Myth of Arm's Length*, 30 TAX NOTES 625, 644 (1986).

Despite the asserted focus on comparability, the arm's length standard has never been used to the exclusion of other, more flexible approaches. Indeed, a study determined that direct comparables were located and applied in only 3% of IRS's adjustments prior to the 1986 amendment. U.S. GEN. ACCOUNTING OFFICE, GGD-81-81, IRS COULD BETTER PROTECT U.S. TAX INTERESTS IN DETERMINING THE INCOME OF MULTINATIONAL CORPORATIONS 29 (1981). The decades following the 1968 regulations involved

> a gradual realization by all parties concerned, but especially Congress and the IRS, that the [arm's length standard], firmly established . . . as the sole standard under section 482, did not work in a large number of cases, and in other cases its misguided application produced inappropriate results. The result was a deliberate decision to retreat from the standard while still paying lip service to it.

Reuven S. Avi-Yonah, *The Rise & Fall of Arm's Length: A Study in the Evolution of U.S. International Taxation*, 15 VA. TAX REV. 89, 112 (1995); *see also* James P. Fuller, *Section 482: Revisited Again*, 45 TAX L. REV. 421, 453 (1990) ("[T]he 1986 Act's commensurate with income standard is not really a new approach to § 482."). The arm's length standard had proven to be similarly illusory in international contexts. Langbein, *supra*, at 649.

B

As controlled transactions increased in frequency and complexity, Congress determined that legislative action was necessary. The Tax Reform Act of 1986 reflected Congress's

view that strict adherence to the arm's length standard prevented tax parity.

The House Ways and Means Committee recommended the addition of the commensurate with income clause because it was "concerned" that the current statute and regulations "may not be operating to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles . . . ." H.R. REP. NO. 99-426, at 423 (1985). The clause was intended to correct a "recurrent problem"—"the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables." *Id.* at 423–24.

Congress intended the commensurate with income standard to displace a comparability analysis where comparable transactions cannot be found:

> A fundamental problem is the fact that the relationship between related parties is different from that of unrelated parties. . . . [M]ultinational companies operate as an economic unit, and not "as if" they were unrelated to their foreign subsidiaries.
>
> . . .
>
> Certain judicial interpretations of section 482 suggest that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe

harbor" for related party pricing arrangements, even though there are significant differences in the volume and risks involved, or in other factors. . . . [S]uch an approach is sufficiently troublesome where transfers of intangibles are concerned that a statutory modification to the intercompany pricing rules regarding transfers of intangibles is necessary.

. . .

. . . There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. The committee thus concludes that it is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation . . . be commensurate with the income attributable to the intangible. . . .

. . .

. . . [T]he committee intends to make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor minimum payment for related party intangible transfers. Where taxpayers transfer intangibles with a high profit potential, the compensation for the intangibles should be greater than industry averages or norms. . . .

*Id.* at 423–25.

The Conference Committee suggested only one change—to broaden the sweep of the amendment so as to encompass domestic related party transactions—in order to better serve the objective of the amendment, "that the division of income between related parties reasonably reflect the relative economic activity undertaken by each . . . ." H.R. CONF. REP. NO. 99-841, at II-637 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4725. It also clarified that cost-sharing arrangements qualify as QCSAs only "if and the extent . . . the income allocated among the parties reasonably reflect the actual economic activity undertaken by each." H.R. CONF. REP. NO. 99-841, at II-638, 1986 U.S.C.C.A.N. at 4726.

C

Treasury's first response to the Tax Reform Act was the "White Paper," an intensive study published in 1988. *A Study of Intercompany Pricing under the Code*, I.R.S. Notice 88-123, 1988-C.B. 458 ("White Paper"). The White Paper makes clear that Treasury initially understood the commensurate with income standard to be consistent with the arm's length standard (and that Treasury understood Congress to share that understanding). *Id.* at 475. Treasury wrote that a comparability analysis must be performed where possible, *id.* at 474, but it also suggested a "clear and convincing evidence" standard for comparables, suggesting that a comparability analysis would rarely suffice, *id.* at 477–78.

Despite its use of the phrase "arm's length standard," the White Paper signaled a dramatic shift from the standard as it had been defined following the 1968 regulations. Treasury advanced a new allocation method, the "basic arm's length return method," *id.* at 488, which—contrary to its

name—would apply only in the absence of comparables and would essentially split profits between the related parties, *id.* at 490.**[4]**  The White Paper's re-framing of the arm's length standard was not novel:

> [D]espite the Treasury's affirmation of the traditional [arm's length standard] in its 1988 White Paper, this narrow conception . . . was already obsolete by 1988 in the large majority of cases, insofar as the United States' approach to international taxation was concerned.  Subsequent developments, especially the recently issued proposed, temporary and final regulations under section 482 of the Code, merely strengthened the nails in its coffin.

Avi-Yonah, *supra*, at 94–95.

The White Paper was silent regarding employee stock compensation—unsurprisingly, as the practice did not develop on a major scale until the 1990s.  Zvi Bodie, Robert S. Kaplan, & Robert C. Merton, *For the Last Time: Stock Options Are an Expense*, 81 HARV. BUS. REV. 62, March 2003, at 63, 67 (March 2003).

---

**[4]** Contemporary commentators understood that, by attempting synthesis between the arm's length and commensurate with income provisions, Treasury was moving away from a view of the arm's length standard as grounded in comparability.  Marc M. Levy, Stanley C. Ruchelman, & William R. Seto, *Transfer Pricing of Intangibles after the Section 482 White Paper*, 71 J. TAX'N 38, 38 (1989); Josh O. Ungerman, Comment, *The White Paper: The Stealth Bomber of the Section 482 Arsenal*, 42 SW. L.J. 1107, 1128–29 (1989).

In 1994 and 1995, Treasury issued the regulations challenged in *Xilinx*. As in previous iterations, the 1994–1995 regulations defined the arm's length standard as results-oriented, meaning that the goal is parity in taxable income rather than parity in the method of allocation itself. Treas. Reg. § 1.482-1(b)(1) (1994) ("A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)."). The arm's length standard remained "the standard to be applied in every case." § 1.482-1(b)(1) (1994).

The regulations also set forth methods by which income could be allocated among related parties in a manner consistent with the arm's length standard. § 1.482-1(b)(2)(i) (1994). Absent from the list of approved methods was the method outlined in the singular cost-sharing regulation separately issued in 1995, § 1.482-7. The 1995 regulation provided that intangible development costs included "all of the costs incurred by . . . [an uncontrolled] participant related to the intangible development area." Treas. Reg. § 1.482-7(d)(1) (1995). Beginning in 1997, the Secretary interpreted the "all . . . costs" language to include stock-based compensation, meaning that controlled taxpayers had to share the costs (and associated deductions) of providing employee stock compensation. *Xilinx v. Comm'r*, 598 F.3d 1191, 1193–94 (9th Cir. 2010).

According to Treasury, the 1994 regulations defined the arm's length standard in terms of "the results that would have been realized if uncontrolled taxpayers had engaged in the same transactions under the same circumstances." Compensatory Stock Options Under Section 482 (Proposed),

67 Fed. Reg. 48,997, 48,998 (July 29, 2002). On the other hand, the 1995 regulation, consistent with the 1986 Conference Report excerpted above, "implement[ed] the commensurate with income standard in the context of cost sharing arrangements" by "requir[ing] that controlled participants in a [QCSA] share all costs incurred that are related to the development of intangibles in proportion to their shares of the reasonably anticipated benefits attributable to that development." *Id.* Recognizing the potential for conflict between the 1994 and 1995 regulations (also discussed by this Court in *Xilinx*, as described below), Treasury later issued new cost-sharing regulations, the 2003 regulations that Altera now challenges.

IV

We turn then, to the disputed 2003 amendments to the regulations, which Treasury intended to clarify rather than overhaul the 1994 and 1995 regulations. The clarifications were two-fold. First, the amendments expressly classified employee stock compensation as a cost to be allocated between QCSA participants. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,998; Treas. Reg. § 1.482-7A(d)(2). Second, the "coordinating" amendments clarified Treasury's understanding that the cost-sharing regulations, including § 1.482-7A(d)(2), operate to produce an arm's length result. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 49,000; Treas. Reg. § 1.482-7A(a)(3).

Altera challenges two regulations. It squarely challenges 26 C.F.R. § 1.482-7A(d)(2). It also objects to § 1.482-7A(a)(3), but only insofar as it incorporates § 1.482-7A(d)(2) by reference.

Broadly, § 1.482-7A provides that costs are shared by parties to a QCSA, a controlled cost-sharing arrangement that meets the standards of the cost-sharing regulations and thus enables the participants to avoid an IRS adjustment. Section 1.482-7A(a)(3) incorporates and attempts synthesis with the arm's length standard:

> A qualified cost sharing arrangement produces results that are consistent with an arm's length result . . . if, and only if, each controlled participant's share of the costs (as determined under paragraph (d) of this section) of intangible development under the qualified cost sharing arrangement equals its share of reasonably anticipated benefits attributable to such development . . . .

Section 1.482-7A(d)(2) provides that parties to a QCSA must allocate stock-based compensation between themselves:

> [In a QCSA], a controlled participant's operating expenses include all costs attributable to compensation, including stock-based compensation. As used in this section, the term stock-based compensation means any compensation provided by a controlled participant to an employee or independent contractor in the form of equity instruments, options to acquire stock (stock options), or rights with respect to (or determined by reference to) equity instruments or stock options, including but not limited to property to which section 83 applies and stock options to which section 421 applies, regardless of

whether ultimately settled in the form of cash, stock, or other property.

Altera does not challenge the allocation of other intangible development costs under § 1.482-7A(d).

In determining whether Treasury's regulation is permissible, we are faced with two questions: whether Treasury's "decreed result [is] within the scope of its lawful authority," and whether "the process by which it reache[d] that result [was] logical and rational." *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quoting *State Farm*, 463 U.S. at 43). Consideration of these issues requires examination of the APA and *Chevron* deference.

The Tax Court correctly held that the APA applies to Treasury in the context of the present controversy. *See Mayo Found. for Med. Ed. & Res. v. United States*, 562 U.S. 44, 55 (2011) ("In the absence of [any] justification, we are not inclined to carve out an approach to administrative review good for tax law only.").[5]

Under the APA, we must "hold unlawful and set aside agency action, findings, and conclusions found to be . . .

[5] Because the Commissioner does not contest the applicability of the APA or *Chevron* in this context, this case does not require us to decide the broader questions of the precise contours of the application of APA to the Commissioner's administration of the tax system or the continued vitality of the theory of tax exceptionalism. *See generally, e.g.*, Stephanie Hoffer and Christopher J. Walker, *The Death of Tax Court Exceptionalism*, 99 MINN. L. REV. 221 (2014); Kristin E. Hickman, *Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 82 NOTRE DAME L. REV. 1727 (2007).

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)–(D).  However, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

If we conclude that Treasury complied with the APA in its rulemaking, we apply the familiar *Chevron* standard in examining the agency's interpretation of the statute that defines the scope of its authority.  *Chevron*, 467 U.S. at 843.

A

Accordingly, our first task is to determine whether Treasury complied with the APA in the first instance.  Only if Treasury complied with the APA may we  defer to its interpretation of § 482 under *Chevron*.  *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016).[6]

---

[6] We note that the procedural posture of this case—following enforcement— differs from that of a typical case challenging a regulation under the APA.  Generally, strict APA-based challenges arise in the pre-enforcement context, which is less disruptive to the agency and which allows plaintiffs to avoid the six-year statute of limitations applicable to APA-based challenges.  *See* 28 U.S.C. § 2401.  By contrast, post-enforcement challenges, often brought after the six-year statute of limitations, are rarely brought under the APA, even if the APA proves relevant.  Rather, courts are generally called on to address the degree of deference to which the agency is entitled.  In these typical post-enforcement challenges, the ultimate question is not whether the agency action was procedurally defective but rather whether it was a permissible exercise of executive authority.  The court focuses not on the APA but on the statute as it is implemented by the agency.

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness . . . ." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). It "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'" *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015) (citing 5 U.S.C. § 553). First, a "[g]eneral notice of proposed rule making" must ordinarily be published in the Federal Register." 5 U.S.C. § 553(b). Second, provided that "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." § 553(c). " An agency must consider and respond to significant comments received during the period for public comment." *Perez*, 135 S.Ct. at 1203. Third, the agency must incorporate in the final rule "a concise general statement of [its] basis and purpose." § 553(c).

1

Altera does not dispute that Treasury satisfied the first step by giving notice of the 2003 regulations. *Altera*, 14 T.C. at 103. Nor does there appear to be a controversy as to whether Treasury included in the final rule "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553. Rather, Altera argues that the regulations fail on the second step, asserting that although Treasury solicited public comments, it did not adequately consider and respond to those responses, rendering the regulations arbitrary and capricious under *State Farm*. *Altera*, 14 T.C. at 120–31. We disagree.

Section 706 of the APA directs courts to "decide all relevant questions of law, interpret constitutional and

statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706 (flush language). Agencies may not act in ways that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Following *State Farm*, the touchstone of arbitrary and capricious review under the APA is "reasoned decisionmaking." *State Farm*, 463 U.S. at 52. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan*, 135 S. Ct. at 2706 (quoting *State Farm*, 463 U.S. at 43). However, courts may not set aside agency action simply because the rulemaking process could have been improved; rather, we must determine whether the agency's "path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys*, 419 U.S. 281, 286 (1974)).

Altera argues that Treasury's rulemaking process does not sufficiently support the regulations, which Altera understands to be a significant departure from Treasury's earlier regulations implementing § 482. This argument is premised on: (1) Treasury's rejection of the comments submitted in opposition to the proposed rule, and (2) Altera's claim that Treasury's current litigation position is inconsistent with statements made during the rulemaking process.

"[A]n agency need only respond to 'significant' comments, *i.e.*, those which raise relevant points and which, if adopted, would require a change in the agency's proposed

rule." *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (quoting *Home Box Office v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977)). If the comments to which the agency did not respond would not bear on the agency's "consideration of the relevant factors," the court may not reverse the agency's decision. *Id.*

Treasury published its notice of proposed rulemaking in 2002. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. 48,997. In its notice, Treasury made clear that it was relying on the commensurate with income provision. *Id.* at 48,998. To support its position, Treasury drew from the legislative history of the 1986 amendment, explaining that Congress intended a party to a QCSA to "bear its portion of all research and development costs." *Id.* (quoting H.R. CONF. REP. NO. 99-841, at II-638). It also informed interested parties of its intent to coordinate the new regulations with the arm's length standard, suggesting that it was attempting to synthesize the potentially disparate standards found within § 482 itself. *Id.*; at 48,998, 49,000–01.

Commenters responded by attacking the proposed regulations as inconsistent with the traditional arm's length standard. To support their position, they primarily discussed arm's length agreements in which unrelated parties did not mention employee stock options. They explained that unrelated parties do not share stock compensation costs because it is difficult to value stock-based compensation, and there can be a great deal of expense and risk involved.

In the preamble to the final rule, Treasury dismissed the comments (and, relatedly, the behavior of controlled taxpayers) as irrelevant:

Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account for purposes of QCSAs is consistent with the legislative intent underlying section 482 and with the arm's length standard (and therefore with the obligations of the United States under its income tax treaties . . .). The legislative history of the Tax Reform Act of 1986 expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent with the arm's length standard, if and to the extent that the participants' shares of income "reasonably reflect the actual economic activity undertaken by each." *See* H.R. CONF. REP. NO. 99-481, at II-638 (1986). . . . [I]n order for a QCSA to reach an arm's length result consistent with legislative intent, the QCSA must reflect all relevant costs, including such critical elements of cost as the cost of compensating employees for providing services related to the development of the intangibles pursuant to the QCSA. Treasury and the IRS do not believe that there is any basis for distinguishing between stock-based compensation and other forms of compensation in this context.

Treasury and the IRS do not agree with the comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's

length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances. . . . The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA. . . .

Compensatory Stock Options under Section 482 (Preamble to Final Rule), 68 Fed. Reg. 51,171, 51,172–73 (Aug. 26, 2003).

Treasury added:

Treasury and the IRS believe that if a significant element of [the costs shared by unrelated parties] consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation.

*Id.* at 51,173.

With its references to legislative history, Treasury communicated its understanding that Congress had called upon it to move away from the traditional arm's length standard.

In short, the objectors were arguing that the evidence they cited—showing that unrelated parties do not share employee

stock compensation costs—proved that Treasury's commensurate with income analysis did not comport with the arm's length standard. Thus, the thrust of the objection was that Treasury misinterpreted § 482. But that is a separate question—one properly addressed in the *Chevron* analysis. That commenters disagreed with Treasury's interpretation of the law does not make the rulemaking process defective.

Under the APA, the issue is whether Treasury's references to legislative history gave interested parties notice of its proposal and an opportunity to respond to it. Here, Treasury's "path may reasonably be discerned." *State Farm*, 463 U.S. at 43. Treasury's citations to legislative history in the notice of proposed rulemaking and the preamble to the final rule make clear enough why Treasury believed it could require related parties to share all costs—including employee stock compensation—in proportion to the income enjoyed by each. Treasury set forth its understanding that it should not examine comparable transactions when they do not in fact exist and should instead focus on a fair and reasonable allocation of costs and income. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,998 (quoting H.R. Conf. Rep. No. 99-841, at II-638); *accord* Compensatory Stock Options under Section 482 (Preamble to Final Rule), 68 Fed. Reg. at 51,172. Treasury relied on Congressional rejection of primacy of the traditional arm's length standard. None of the comments at issue address why Treasury was mistaken in its understanding that it was authorized to use a method that did not include comparables.

Thus, Treasury's refusal to credit oppositional comments is not fatal to a holding that it complied with the APA. Treasury gave sufficient notice of what it intended to do and why; it considered the comments, but it rejected them.

Because the comments had no bearing on "relevant factors" to the rulemaking, nor any bearing on the final rule, there was no APA violation.  *Am. Mining Congress*, 965 F.2d at 771.

Further, Treasury's current litigation position is not inconsistent with the statements it made to support the 2003 regulations at the time of the rulemaking.  Altera argues that its position is justified by *SEC v. Chenery Corp.*, 332 U.S. 194 (1947).  "[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency." *Chenery*, 332 U.S. at 196.  "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."  *Id.*

Altera argues that the Commissioner cannot now claim that "Treasury reasonably determined that it was statutorily authorized to dispense with comparability analysis" because "[n]owhere in the regulatory history did the Secretary suggest that he 'was statutorily authorized to dispense with comparability analysis.'"  This argument twists *Chenery*, which protects judicial deference by strengthening administrative processes, into excessive proceduralism.  *See Nat'l Elec. Mfrs. Ass'n v. U.S. Dept. of Energy*, 654 F.3d 496, 515 (4th Cir. 2011) ("[*Chenery*] does not oblige the agency to provide exhaustive, contemporaneous legal arguments to preemptively defend its action.").  But it is also inconsistent with the record, given Treasury's citation to legislative history.

2

Altera also argues that Treasury did not adequately support its position that employee stock compensation is a

cost. Treasury cites generally to "tax and other accounting principles" for its determination that there is a "cost associated with stock-based compensation." Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,999. Treasury classifies stock compensation as a "critical element" of R&D costs and notes that it is "clearly related to the intangible development area." Compensatory Stock Options under Section 482 (Preamble to Final Rule), 68 Fed. Reg. at 51,173.

The rulemaking record is sufficient to survive an APA challenge because Treasury's position is supported by logic and by industry norms. Treasury wrote that parties would not "ignore" stock-based compensation if such compensation were a "significant element" of the compensation costs one party incurs and another party agrees to reimburse. *Id.* at 51,173. Treasury's determination is reasonable because parties dealing at arm's length certainly would not grant stock options to each other's employees without mentioning the arrangement in the cost-sharing agreement. In other words, parties dealing at arm's length simply do not share these costs, but related parties, whose stock is commonly owned, do. "[T]hrough bargaining," each unrelated party ensures that the cost-sharing agreement is in its best interest, meaning that the parties will consider the internal costs of stock compensation without requiring the other party to recognize those costs. *Id.*

A distinction exists between the economic costs of stock compensation—which are debatable—and the accounting costs—which are not. Because entities account for the cost of providing employee stock options, it is reasonable for Treasury to allocate the costs, and it is irrelevant how much the same entity ultimately pays to provide the options.

Further, as the Commissioner noted, "tax and other accounting principles" provide a strong foundation for the Commissioner's interpretation.

Most notably, the Tax Code classifies stock-based compensation as a trade or business "expense." 26 U.S.C. § 162(a). And the challenged regulation cites to the provision providing that the expense is deductible. Treas. Reg. § 1.482-7A(d)(2)(iii)(A) (citing 26 U.S.C. § 83(h)) ("[T]he operating expense attributable to stock-based compensation is equal to the amount allowable . . . as a deduction for Federal income tax purposes . . . (for example, under 83(h)) . . . ."). Indeed, the dispute here is not truly whether stock-based compensation is a cost but whether Altera— rather than the Commissioner—may decide how to apportion that cost between related entities.

3

Finally, in addition to its general *State Farm* argument, Altera asks for a more searching review under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502. Altera claims that the cost-sharing amendments present a major shift in administrative policy such that Treasury could not issue the regulations without carefully considering and broadcasting its decision. Altera argues that "[t]he assertion that the commensurate with income clause supplants the arm's-length standard with a 'purely internal' analysis is a sharp—but unacknowledged— reversal from Treasury's long-standing prior policy." Red Br. 47.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars*, 136 S.Ct. at 2125. Indeed, "[w]hen an

agency changes its existing position, it 'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Id.* at 2125–26 (quoting *Fox*, 556 U.S. at 515). However, an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox*, 556 U.S. at 515.

> [A] policy change complies with the APA if the agency:
>
> (1) displays "awareness that it is changing position,"
>
> (2) shows that "the new policy is permissible under the statute,"
>
> (3) "believes" the new policy is better, and
>
> (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (ellipses in original) (quoting *Fox*, 556 U.S. at 515–16).

This argument is not meaningfully different from Altera's general APA argument. If the arm's length standard allows the Commissioner to allocate costs between related parties without a comparability analysis, there is no policy change,

merely a clarification of the same policy. Moreover, even if the policy changed, it changed well before 2003, as *Xilinx* demonstrates. And if so, it changed as a result of the 1986 amendment to § 482, in which case the question is, again, whether the cost-sharing regulations are allowable under *Chevron*.

### 4

Thus, the 2003 regulations are not arbitrary and capricious under the standard of review imposed by the APA. Treasury's regulatory path may be reasonably discerned. Treasury understood § 482 to authorize it to employ a purely internal, commensurate with income approach in dealing with related companies. It provided adequate notice of its intent and adequately considered the objections. Its conclusion that stock based compensation should be treated as a cost was adequately supported in the record, and its position did not represent a policy change under *Fox*.

### B

Having determined that Treasury adequately satisfied the *State Farm* requirements, we turn to *Chevron*.

### 1

Under *Chevron*, we first apply the traditional rules of statutory construction to determine whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. We start with the plain statutory words, and "when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, __ U.S. __,

__, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). In addition, we examine the legislative history, the statutory structure, and "other traditional aids of statutory interpretation" in order to ascertain congressional intent. *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981). If, after conducting that *Chevron* step one examination, we conclude that the statute is silent or ambiguous on the issue, we then defer to the agency's interpretation so long as "it is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. A permissible construction is one that is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

Ultimately, questions of deference boil down to whether "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). "When Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* at 227 (internal citation and footnote omitted) (quoting *Chevron*, 467 U.S. at 843–44).

Here, the resolution of our step one *Chevron* examination is straightforward. Section 482 does not speak directly to whether the Commissioner may require parties to a QCSA to share employee stock compensation costs in order to receive the tax benefits associated with entering into a QCSA. Further, as the text of the statute and its legislative history

indicate, Congress intended to provide Treasury with the flexibility it needed to prevent improper cost and income allocation between related parties for the purpose of defeating tax liability.

Thus, we must move on to *Chevron* step two to consider whether Treasury's interpretation of § 482 as to allocation of employee stock option costs is permissible. An agency's interpretation of statutory authority is examined "in light of the statute's text, structure and purpose." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007). The interpretation fails if it is "unmoored from the purposes and concerns" of the underlying statutory regime. *Judulang*, 565 U.S. at 64. Thus, Congress's purpose in enacting and amending § 482 in 1986 is key to resolution of this issue. That purpose is parity. *First Sec. Bank of Utah*, 405 U.S. at 400. The 1986 amendment reflected Congress's recognition that the traditional arm's length standard did not serve the purpose of § 482.

The 1986 amendment to § 482 provides that: "In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." This is a purely internal standard, and evidence supports Treasury's belief that Congress intended it to be. H.R. REP. NO. 99-426, at 423–35; H.R. CONF. REP. NO. 99-841, at II-637. Indeed, Congress's objective in amending § 482 was to ensure that income follows economic activity. H.R. CONF. REP. No. 99-841, at II-637. Further, legislative history supports Treasury's application of the commensurate with income standard in the QCSA context. Congress did not want to interfere with controlled cost-sharing arrangements, but only to the degree that the allocation of costs and income

"reasonably reflect[s] the actual economic activity undertaken by each." H.R. CONF. REP. No. 99-841, at II-638. Treasury's decision to dispense with a comparability analysis was reasonable.

So was Treasury's determination that uncontrolled cost-sharing arrangements do not provide helpful guidance regarding allocations of employee stock compensation. As discussed above, Treasury discounted the relevance of comments demonstrating that parties at arm's length do not share employee stock compensation costs, writing: "The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA." Compensatory Stock Options under Section 482 (Preamble to Final Rule), 68 Fed. Reg. at 51,173.

Treasury's conclusion is entirely consistent with Congress's rationale for amending § 482 in the first place. *See id.* (citing H.R. REP. NO. 99-426, at 423–25) ("As recognized in the legislative history of the Tax Reform Act of 1986, there is little if any, public data regarding transactions involving high-profit intangibles."); *see also* H.R. REP. NO. 99-426, at 425 ("There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. . . . [I]t is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation be commensurate with the income attributable to the intangible.").[7]

---

[7] Although the 2017 amendment to § 482 has no bearing on our opinion, we note that Congress has not changed its mind:

As Congress noted, the goal of parity is not served by a constant search for comparable transactions. H.R. REP. NO. 99-426, at 423. That is why, in 1986, it acted by adding the commensurate with income standard to § 482, synthesizing the long-standing arm's length standard with the new provision; without an internal approach to allocation, related parties had been able to escape paying the taxes that would be paid by parties dealing at arm's length. In other words, the amendment was intended to hone the definition of the arm's length standard so that it could work to achieve arm's length results instead of forcing application of arm's length methods.

> The transfer pricing rules of section 482 and the accompanying Treasury regulations are intended to preserve the U.S. tax base by ensuring that taxpayers do not shift income properly attributable to the United States to a related foreign company through pricing that does not reflect an arm's length result. . . . The arm's length standard is difficult to administer in situations in which no unrelated party market prices exist for transactions between related parties.
>
> . . .
>
> For income from intangible property, section 482 provides 'in the case of any transfer (or license) of intangible property (within the meaning of section 936 (h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.' By requiring inclusion in income of amounts commensurate with the intangible, Congress was responding to concerns regarding the effectiveness of the arm's-length standard with respect to intangible property—including, in particular, high-profit-potential intangibles.

H. REP. NO. 115-466, at 574–75 (2017).

Thus, the 2003 regulations are not "arbitrary and capricious in substance." *Mayo Found.*, 562 U.S. at 53 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242 (2004)). Treasury reasonably understood § 482 as an authorization to require internal allocation methods in the QCSA context, provided that the costs and income allocated are proportionate to the economic activity of the related parties. Treasury's interpretation is not "arbitrary, capricious, or manifestly contrary to the statute," and it is therefore permissible under *Chevron*. 467 U.S. at 844.

2

Altera contends that the Commissioner misreads § 482 and its history, arguing that the addition of the commensurate with income standard to § 482 did nothing to change the meaning and operation of the arm's length standard. Altera supports its argument with a canon of construction: "Amendments by implication, like repeals by implication, are not favored." *United States v. Welden*, 377 U.S. 95, 102 n.12 (1964). The canon does not apply here. It operates to prevent courts from attributing unspoken motives to legislators, not to force courts to ignore legislative action. It is illogical to argue that an amendment does not change the meaning of the statute that is amended. Moreover, Altera's conclusion, that the commensurate with income standard is one method of satisfying the arm's length standard, is one with which the Commissioner agrees.

Altera's interpretation of the 1986 amendment would render the commensurate with income clause meaningless except in two circumstances: (1) to allow the Commissioner to periodically adjust prices initially assigned following a comparability analysis; and (2) to reflect a party's

contribution of existing intangible property or "buy-in" to a cost-sharing arrangement.  This narrow reading of § 482 is not supported by the text or history of the  1986 amendment.

The Commissioner's allocation of employee stock compensation costs between related parties is necessary for Treasury to fulfill its obligation under § 482.  Congress did not intend to interfere with qualified cost-sharing arrangements when those arrangements provided for the allocation of income consistent with the commensurate with income provision.  H.R. CONF. REP. NO. 99-841, at II-638.

3

Altera makes much of the United States's treaty obligations with other countries.  However, there is no evidence that the unworkable empiricism for which Altera argues is also incorporated into our treaty obligations.  As demonstrated by nearly a century of interpreting § 482 and its precursor, the arm's length standard is aspirational, not descriptive.  It reflects neither how related parties behave nor how they are taxed.  Moreover, our most recent treaties incorporate not only the arm's length standard, but also the 2003 regulations. *See, e.g.*, Technical Explanation of the US-Poland Tax Treaty, at 31 (Feb. 13, 2013) ("It is understood that the Code section 482 'commensurate with income' standard for determining appropriate transfer prices for intangibles operates consistently with the arm's-length standard.  The implementation of this standard in the regulations under Code section 482 is in accordance with the general principles of paragraph 1 of Article 9 of the Convention . . . .").

The 1986 amendment focused specifically on intangibles, and it gives Treasury the ability to respond to rapid changes in the high tech industry. "The broad language of [§ 482] reflects an intentional effort to confer the flexibility necessary to forestall . . . obsolescence." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). In the modern economy, employee stock options are integral to R&D arrangements. In fact, in Altera's 2015 annual report, its stock-based compensation cost equaled nearly five percent of total revenue. Altera Corp., Annual Report for the Fiscal Year Ended Dec. 31, 2014 (Form 10-K). Simply speaking, the rise in employee stock compensation is an economic development that Treasury cannot ignore without rejecting its obligations under § 482.

4

Altera also argues that the outcome of this case is controlled by our Court's decision in *Xilinx.* We disagree. While the *Xilinx* panel could have reached a holding that would foreclose the Commissioner's current position, it did not.

In *Xilinx*, this Court considered the 1994 and 1995 cost-sharing regulations. The case involved a matter of regulatory interpretation, not executive authority. Xilinx, Inc., another maker of programmable logic devices, challenged the Commissioner's allocation of employee stock options between Xilinx and its Irish subsidiary. 598 F.3d at 1192. As framed by the panel, the issue was whether § 1.482-1 (1994)—which sets forth the arm's length standard—could be reconciled with § 1.482-7(d)(1) (1995)—under which parties to a QCSA were required to share "all . . . costs" incurred in developing intangibles. *Id.* at 1195.

Initially the panel, in a 2–1 decision, voted to reverse the Tax Court, which had unanimously struck the 1995 cost-sharing regulations. *Xilinx, Inc. v. Comm'r*, 567 F.3d 482 (9th Cir. 2009), *withdrawn* 592 F.3d 1017 (9th Cir. 2010). However, the panel withdrew its first opinion after reconsideration, and the panel—over Judge Reinhardt's dissent—ultimately affirmed the Tax Court in striking the regulations. *Xilinx*, 598 F.3d 1191. As framed by all three judges in both the withdrawn and final opinions, the issue came down to whether the arm's length standard and all costs provision could be synthesized. All three judges determined that synthesis was impossible, and the conflict was therefore whether the arm's length standard, versus the all costs provision, had priority .

*Xilinx* does not control for two reasons. First, the parties in *Xilinx* were not debating administrative authority, and the Court did not consider the "commensurate with income" standard, which Congress itself did not see as inconsistent with the arm's length standard.    Second, and more significantly, the *Xilinx* panel was faced with a conflict between two rules.    If the rules were conceptually distinguishable, they were also in direct conflict. The arm's length rule, § 1.482-1(b)(1) (1994), listed specific methods for calculating an arm's length result. The all costs provision was not one of those methods, as the first *Xilinx* majority noted.    567 F.3d at 491. Treasury issued the coordinating amendment in 2003, after the tax years at issue in *Xilinx*, and the arm's length regulation now expressly references the cost-sharing provision that Altera challenges. The *Xilinx* panel did not address the "open question" of whether the 2003 regulations remedied the error identified in that decision. 598 F.3d at 1198 n.4 (Fisher, J., concurring). Today, there is

no conflict in the regulations, and Altera does not challenge the regulations on the ground that a conflict exists.

V

In sum, we conclude that the Commissioner did not exceed the authority delegated to him by Congress. The Commissioner's rule-making complied with the APA, and its regulation is entitled to *Chevron* deference.

**REVERSED.**

O'MALLEY, Circuit Judge, dissenting:

A "foundational principle of administrative law [is] that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) (citing *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 87 (1943)). In promulgating the rule we consider here, Treasury repeatedly insisted that it was applying the traditional arm's length standard and that the resulting rule was consistent with that standard. Today, however, the majority holds that Treasury's citation to the legislative history surrounding the enactment of the Tax Reform Act of 1986 "communicated its understanding that Congress had called upon it to move away from the historical arm's length standard." Op. 31. And the majority finds that, despite Treasury's own statements to the contrary, that same citation to legislative history sufficed to "make it clear enough" to interested parties that Treasury was changing its longstanding practice of applying the arm's length standard in all but the narrowest of circumstances. Op. 32.

The majority, in effect, "suppl[ies] a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 196 (1947)). It also endorses a practice of requiring interested parties to engage in a scavenger hunt to understand an agency's rulemaking proposals. That is inconsistent with another fundamental Administrative Procedure Act ("APA") principle: that a notice of proposed rulemaking "should be sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticism and comments." *Am. Mining Cong. v. U.S. EPA*, 965 F.2d 759, 770 (9th Cir. 1991) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 48 (D.C. Cir. 1976) (en banc)). In doing both of these things, the majority stretches "highly deferential" review, *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)), beyond its breaking point.

I instead would find, as the Tax Court did, that Treasury's explanation of its rule did not satisfy the *State Farm* standard; that Treasury did not provide adequate notice of its intent to change its longstanding practice of employing the arm's length standard; and that its new rule is invalid as arbitrary and capricious. I would also hold that this court's previous decision in *Xilinx, Inc. v. Commissioner of Internal Revenue* (*Xilinx II*), 598 F.3d 1191 (9th Cir. 2010), controls and mandates an order affirming the Tax Court's decision. I therefore would affirm the judgment of the Tax Court that expenses related to stock-based compensation are not among the costs to be shared in qualified cost sharing arrangements ("QCSAs") under Treas. Reg. § 1.482-7(d)(1) (as amended in

2013).  *See Altera Corp. v. Comm'r*, 145 T.C. 91, 92 (2015).
For these reasons, I respectfully dissent.

I.  BACKGROUND

A.  The Arm's Length Standard

"The purpose of section 482 is to place a controlled
taxpayer on a tax parity with an uncontrolled taxpayer by
determining, according to the standard of an uncontrolled
taxpayer, the true taxable income from the property and
business of a controlled taxpayer."  *Comm'r v. First Sec.
Bank of Utah*, 405 U.S. 394, 400 (1972) (quoting Treas. Reg.
§ 1.482-1(b)(1) (1971)).  The "touchstone" of this tax parity
inquiry is the arm's length standard.  *Xilinx II*, 598 F.3d at
1198 n.1 (Fisher, J., concurring).  Since the 1930s, Treasury
regulations consistently have explained that, "[i]n
determining the true taxable income of a controlled taxpayer,
the standard to be applied in every case is that of a taxpayer
dealing at arm's length with an uncontrolled taxpayer."
Treas. Reg. § 1.482-1(b)(1) (2003).  That is, income and
deductions are to be allocated among related companies in the
same way that unrelated companies negotiating at arm's
length would allocate the same income and deductions.

The 1986 amendment that introduced the commensurate
with income standard did not dislodge the arm's length test.[1]

---

[1] This amendment added a second sentence to § 482 that provided:
"In the case of any transfer (or license) of intangible property . . . , the
income with respect to such transfer or license shall be commensurate
with the income attributable to the intangible."  Tax Reform Act of 1986,
Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2562 (codified as
amended at 26 U.S.C. § 482).

Congress explained in the committee report that it was introducing the commensurate with income standard to address a "recurrent problem" with transfers of highly valuable intangible property: "the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables." H.R. REP. NO. 99-426, at 423–24 (1985). Congress noted that "[i]ndustry norms for transfers to unrelated parties of less profitable intangibles frequently are not realistic comparables in these cases," and that "[t]here are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable." *Id.* at 424–25. To address this potential gap, Congress found it "appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation . . . be commensurate with the income attributable to the intangible." *Id.* at 425.

Treasury reiterated in its 1988 "White Paper" that "intangible income must be allocated on the basis of comparable transactions if comparables exist." *A Study of Intercompany Pricing under Section 482 of the Code* ("White Paper"), I.R.S. Notice 88-123, 1988-2 C.B. 458, 474; *see also id.* at 473 (noting that, where "there is a true comparable for" the licensing of a "high profit potential intangible[]," the royalty rate for the license "must be set on the basis of the comparable because that remains the best measure of how third parties would allocate intangible income"). Only "in situations in which comparables do not exist" would the commensurate with income standard apply. *Id.* at 474. Indeed, the United States continued to insist in tax treaties, and in documents that Treasury issued to explain these treaties, that § 482 reflected the arm's length principle. *See Xilinx*, 598 F.3d at 1196–97 (citing tax treaty explanations);

*see also id.* at 1198 n.1 (Fisher, J., concurring) (noting that "the 1997 United States-Ireland Tax Treaty, . . . and others like it, reinforce the arm's length standard as Congress' intended touchstone for § 482").**[2]**

## B.  Treatment of Stock-Based Compensation

Treasury promulgated new regulations governing the tax treatment of controlled transactions in 1994 and 1995.  These regulations affirmed that "the standard to be applied in every case" was the arm's length standard.  Treas. Reg. § 1.482-1(b)(1) (as amended in 1994).   They also provided that intangible development costs included "all of the costs incurred by . . . [an uncontrolled] participant related to the intangible development area."  Treas. Reg. § 1.482-7(d)(1) (as amended in 1995).   The IRS interpreted this latter "all costs" provision to include stock-based compensation, so that related companies in cost-sharing agreements would have to share the costs of providing such compensation.  *Xilinx II*, 598 F.3d at 1193–94.

When Xilinx, Inc. ("Xilinx") challenged the IRS's interpretation, the Tax Court decided that the agency's reading violated Treas. Reg. § 1.482-1, because the IRS had not adduced evidence sufficient to show that unrelated parties transacting at arm's length would share expenses related to

---

**[2]** As the majority observes, more recent tax treaty explanations have also cited the alternative commensurate with income standard.  Op. 42–43 (citing Technical Explanation of the US-Poland Tax Treaty, at 31 (Feb. 13, 2013)).  Even these explanations, however, emphasize the primacy of the arm's length standard, and they assure the reader that the commensurate with income standard "operates consistently with the arm's-length standard."  Technical Explanation of the US-Poland Tax Treaty, at 30–31 (Feb. 13, 2013).

stock-based compensation. *Xilinx v. Commissioner* (*Xilinx I*), 125 T.C. 37, 53 (2005). The Commissioner did not appeal this underlying factual finding and, instead, argued on appeal to this court that Treas. Reg. § 1.482-7 superseded the arm's length requirement of Treas. Reg. § 1.482-1. All three members of the divided panel therefore assumed that sharing expenses related to stock-based compensation would be inconsistent with the arm's length standard. *Xilinx II*, 598 F.3d at 1194 ("The Commissioner does not dispute the tax court's factual finding that unrelated parties would not share [employee stock options] as a cost."); *id.* at 1199 (Reinhardt, J., dissenting) (assuming that the Tax Court "correctly resolved" the issue of whether sharing stock-based compensation costs would constitute an arm's length result). We also assumed that Treas. Reg. § 1.482-7 required stock-based compensation expenses to be shared. *Id.* at 1196 (majority opinion) (noting that the "all costs" provision "does not permit any exceptions, even for costs that unrelated parties would not share"); *id.* at 1199 (Reinhardt, J., dissenting) (assuming that the "all costs" provision includes "employee stock option costs"). But a majority of the panel ultimately held that the arm's length standard, which was the fundamental "purpose" of the regulations, trumped Treas. Reg. § 1.482-7, and therefore that stock-based compensation expenses could not be shared in the absence of evidence that unrelated parties would share such costs. *Id.* at 1196 (majority opinion); *see also id.* at 1198 n.1 (Fisher, J., concurring) (finding "the arm's length standard" to be "Congress' intended touchstone for § 482"). On that ground, we affirmed the Tax Court's judgment in favor of Xilinx. *Id.* at 1196 (majority opinion).

## C.  The Regulations at Issue

While *Xilinx II* was pending before this court, Treasury promulgated the regulations at issue here.  Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171, 51,172 (Aug. 26, 2003) (codified at 26 C.F.R. pts. 1 and 602). The amended regulations sought to reconcile the apparent contradiction between the arm's length standard in Treas. Reg. § 1.482-1 and the requirement that stock-based compensation expenses be shared under Treas. Reg. § 1.482-7.  The former provision now specifies that § 1.482-7 "provides the specific method to be used to evaluate whether a [QCSA] produces results consistent with an arm's length result."  Treas. Reg. § 1.482-1(b)(2)(i) (2003).  And § 1.482-7, in turn, now provides that a QCSA produces an arm's length result "if, and only if," the participants share all of the costs of intangible development—explicitly including costs associated with stock-based compensation—in proportion to their shares of reasonably anticipated benefits attributable to such development.  Treas. Reg. § 1.482-7(d)(2) (2003).

Altera Corp. ("Altera U.S."), a Delaware corporation, and its subsidiary Altera International, a Cayman Islands corporation, (collectively, "Altera") entered into several cost-sharing agreements in 1997, under which Altera U.S. licensed various forms of intangible property to Altera International, and Altera International paid royalties to Altera U.S. *Altera*, 145 T.C. at 92–93.  During the 2004 to 2007 taxable years, Altera U.S. granted stock options and other stock-based compensation to certain of its employees, but costs related to that compensation were not included in the cost pool under the operative cost-sharing agreements.  *Id.* at 93.

Each year from 2004 to 2007, the IRS notified Altera that the cost-sharing payments did not satisfy the new regulations. *Id.* at 94. But when Altera challenged these regulations, the Tax Court unanimously held, as discussed in more detail below, that the explanation Treasury offered in the preamble accompanying the new regulations was insufficient to justify those regulations under *State Farm*. *Id.* at 120–33. The Commissioner appeals that decision.

## II. Discussion

The Tax Court considered and rejected Treasury's stated explanation for its regulation—that Treasury applied the commensurate with income test because it could find no transactions comparable to the QCSAs at issue, and that Treasury's analysis was actually consistent with the arm's length standard. But the Commissioner now argues on appeal, and the majority accepts, that what Treasury was *actually* saying is that § 482 no longer requires an arm's length analysis. I disagree.

## A. The New Rule Is Invalid Under *State Farm*

Under the Administrative Procedure Act, we must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). To satisfy this standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "That is, an agency must 'cogently explain why it has exercised its discretion in a given manner,' and '[i]n

reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."'" *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (alteration in original) (quoting *State Farm*, 463 U.S. at 43, 48).

Although an agency action is not subject to "more searching review" simply because it represents a change in position, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* And an agency may need to "provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . when, for example, . . . its prior policy has engendered serious reliance interests that must be taken into account." *Id.* (citing *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 736, 742 (1996)). "'Unexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Our review of an agency regulation is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (quoting *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). But "an agency's action must be upheld, if at all, on the basis articulated by the

agency itself." *State Farm*, 463 U.S. at 50 (citing *Burlington Truck Lines*, 371 U.S. at 168). For that reason, "we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* at 43 (citing *Chenery II*, 332 U.S. at 196).

I start, therefore, with what Treasury said when it promulgated the regulation at issue. In Treasury's notice of proposed rulemaking, the agency explained the origins of the commensurate with income standard and discussed the White Paper. Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997, 48,998 (proposed July 29, 2002) (to be codified at 26 C.F.R. pt. 1). Treasury noted, in particular, the White Paper's observation "that Congress intended that Treasury and the IRS apply and interpret the commensurate with income standard consistently with the arm's length standard." *Id.* (citing White Paper, 1988-2 C.B. at 458, 477). Treasury then detailed how the proposed rules would function, including that the new rules required stock-based compensation costs to be included among the costs shared in a QCSA to produce "results consistent with an arm's length result." *Id.* at 49,000–01.

Treasury expanded on its reasoning in the preamble to the final rule. It explained that the tax treatment of stock-based compensation in QCSAs would have to be consistent "with the arm's length standard (and therefore with the obligations of the United States under its income tax treaties and with the OECD transfer pricing guidelines)." Compensatory Stock Options Under Section 482, 68 Fed. Reg. at 51,172. Treasury observed, however, that the legislative history of the 1986 amendment to § 482 "expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent

with the arm's length standard, if and to the extent that participants' shares of income 'reasonably reflect the actual economic activity undertaken by each.'" *Id.* (quoting H.R. Conf. Rep. No. 99-481, at II-638 (1986)). Applying this standard, Treasury declared that, "in order for a QCSA to reach an arm's length result consistent with legislative intent," the QCSA must include stock-based compensation among the costs shared. *Id.*

Throughout the preamble, Treasury repeatedly emphasized that it was applying the arm's length standard. Treasury explained, for example, that "[t]he regulations relating to QCSAs *have as their focus* reaching results consistent with what parties at arm's length generally would do if they entered into cost sharing arrangements for the development of high-profit intangibles." *Id.* (emphasis added). Treasury determined that "[p]arties *dealing at arm's length* in [a cost-sharing] arrangement based on the sharing of costs and benefits generally would not distinguish between stock-based compensation and other forms of compensation." *Id.* (emphasis added). And Treasury concluded that "[t]he final regulations provide that stock-based compensation must be taken into account in the context of QCSAs *because* such a result is consistent with the arm's length standard." *Id.* (emphasis added).

Treasury also responded to comments invoking the arm's length standard. *See id.* (rejecting "comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances"). Treasury acknowledged that comparable arm's-length transactions may have been relevant, but it

determined that there were no comparable transactions available for QCSAs for the development of high-profit intangibles:

> While the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard, in the case of QCSAs such data may not be available. As recognized in the legislative history of the Tax Reform Act of 1986, there is little, if any, public data regarding transactions involving high-profit intangibles. The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA.

*Id.* at 51,172–73. Treasury further detailed why it believed that certain comparable transactions proposed by commentators were not in fact comparable. *Id.* at 51,173.

The Tax Court held that Treasury's explanation for its regulation was insufficient under *State Farm*. *Altera*, 145 T.C. at 120–33. It found that Treasury "failed to provide a reasoned basis" for its "belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs." *Id.* at 123. The court acknowledged that agencies need not gather empirical evidence for *some* policy-based propositions, but it held that "the belief that unrelated parties

would share stock-based compensation costs in the context of a QCSA" was not such a proposition. *Id.* In reaching this conclusion, the court observed that commentators submitted significant evidence about whether unrelated parties would share stock-based compensation costs in QCSAs; that the Tax Court itself had made a factual determination on that issue in *Xilinx I*; and that Treasury was required at least to attempt to gather empirical evidence before declaring that no such evidence was available. *Id.* at 123–24.

The Tax Court then detailed why Treasury's explanation for the regulations was insufficient. The court noted that only some QCSAs involved high-profit intangibles or included stock-based compensation as a significant element of compensation, yet Treasury failed to distinguish between QCSAs with and without those characteristics. *Id.* at 125–27. And the court found that Treasury responded only in conclusory fashion to a number of comments identifying comparable transactions or explaining why unrelated parties would not share stock-based compensation costs in QCSAs. *Id.* at 127–30. On these grounds, the Tax Court struck down the regulation. *Id.* at 133–34.

The Commissioner does not meaningfully dispute the Tax Court's determination that Treasury's analysis under the arm's length standard was inadequate and unsupported. The Commissioner now contends, instead, "that, in the context of a QCSA, the arm's-length standard does *not* require an analysis of what unrelated entities do under comparable circumstances." Appellant's Br. 57 (internal quotation marks omitted). In the Commissioner's view, Treasury's detailed explanations regarding its comparability analysis were merely "extraneous observations"—"since Treasury reasonably determined that it was statutorily authorized to dispense with

comparability analysis in this narrow context, there was no need for it to establish that the uncontrolled transactions cited by commentators were insufficiently comparable." Appellant's Br. 64.

The majority accepts Treasury's rationalization. "With its references to legislative history," the majority holds, Treasury adequately "communicated its understanding that Congress had called upon it to move away from the historical arm's length standard." Op. 31. The majority finds that Treasury was therefore entitled to ignore the comments opposing the final rule because they did not "bear on the agency's 'consideration of the relevant factors.'" Op. 28–29 (quoting *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992)). As to Altera's rejoinder that Treasury never suggested that it had the authority to "dispense with" comparability analysis entirely, Appellee's Br. 43, the majority dismisses these arguments as "twist[ing] *Chenery* . . . into excessive proceduralism," Op. 33.

I do not share the majority's view. Treasury may well have believed that, given the fundamental characteristics of stock-based compensation in QCSAs, it could dispense with arm's length analysis entirely. *Cf. Xilinx II*, 598 F.3d at 1197 (Fisher, J., concurring) (hypothesizing why unrelated companies may not share stock-based compensation costs). But the APA required Treasury to *say* that it was taking this position, which departed starkly from Treasury's previous regulations. *See Fox*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."). As we held in *Xilinx*, the previous regulations preserved the primacy of the arm's length standard and its requirement of comparability analysis. *See*

*Xilinx II*, 598 F.3d at 1195–96 (explaining the then-operative version of Treas. Reg. § 1.482-1).

In amending those regulations, however, Treasury never said—either in the notice of proposed rulemaking or in the preamble accompanying the final rule—that the nature of stock compensation in the QCSA context rendered arm's length analysis irrelevant. Treasury instead explained only that it could not conduct an arm's length analysis because comparable transactions could not be found. *See* Compensatory Stock Options Under Section 482, 68 Fed. Reg. at 51,172–73 ("While the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard, in the case of QCSAs such data may not be available."). As the majority acknowledges, in fact, "Treasury set forth its understanding that it should not examine comparable transactions *when they do not in fact exist* and should instead focus on a fair and reasonable allocation of costs and income." Op. 32 (emphasis added).

Treasury itself explained, in effect, that a precondition for the applicability of the commensurate with income standard is the lack of real-world comparable transactions with which to make an arm's-length comparison. The comments submitted were relevant to the issue of whether "similar transactions under similar circumstances" existed. Any such transactions, as Treasury originally admitted, would "ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard." Compensatory Stock Options Under Section 482,

68 Fed. Reg. at 51,172.**[3]**  If Treasury felt that these comments were irrelevant, it presumably would have said so. Treasury's decision to respond to the comments on their merits underscores that Treasury's only justification for eschewing comparability analysis was its belief that no comparable transactions could be found.  The fact that evidence of comparable transactions might support more favorable tax treatment does not mean such comparables do not exist.**[4]**

The APA's safeguards ensure that those regulated do not have to guess at the regulator's reasoning; just as importantly, they afford regulated parties a meaningful opportunity to respond to that reasoning.  Treasury's notice of proposed rulemaking ran afoul of these safeguards by failing to put the relevant public on notice of its intention to depart from traditional arm's length analysis.  *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D. C. Cir. 2009) (holding that a final rule "violates the APA's notice requirement where 'interested parties would have had to "divine [the agency's] unspoken thoughts"'" (alteration in original) (quoting *Int'l Union, United Mine Workers of Am. V. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259–60

---

**[3]** The majority points to no language in the notice of proposed rulemaking that contradicts this understanding.

**[4]** The majority also glosses over the Tax Court's criticism that the final rule applied to all QCSAs, but was based only on Treasury's beliefs about the subset of QCSAs involving "high-profit intangibles" where stock-based compensation is a "significant element" of compensation. *Altera*, 145 T.C. at 125–26 (quoting Compensatory Stock Options Under Section 482, 68 Fed. Reg. at 51,173).  Treasury's failure to explain this leap and the Commissioner's failure to defend it provide another reason that the regulation does not satisfy the *State Farm* standard.

(D.C. Cir. 2005))).  And asking Treasury to show its work in the preamble to its final rule—that is, to set forth when and why the agency believed that arm's length analysis was not required—is not, as the majority suggests, "excessive proceduralism."  Op. 33.  It is the essence of the review that *State Farm* demands.

When the Tax Court conducted that review, it considered the explanation that Treasury offered, and it found that Treasury "failed to provide a reasoned basis" for its "belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs."  *Altera*, 145 T.C. at 123.  The Tax Court set forth in detail why Treasury's explanation for the regulations was insufficient.  *Id.* at 125–30.  Treasury offers no response to these findings; it simply invites this court to recreate the record in order to justify its decisionmaking.  I therefore would hold, as the Tax Court did, that the 2003 regulations are invalid under *State Farm*.

## B.  Section 482 Does Not Require Sharing of Stock-Based Compensation Costs

Because I would find the 2003 regulations were invalid, I believe that this court's decision in *Xilinx II* controls, and that the Tax Court properly entered judgment in favor of Altera.  *Altera*, 145 T.C. at 134.  Even if *Xilinx II* did not control, I would hold that related parties in QCSAs need not share costs associated with stock-based compensation.  "*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *United States v. Mead Corp.*,

533 U.S. 218, 227 (2001)).  I therefore would interpret the statute in the first instance, without deference.

I agree with the majority that § 482 does not address this issue directly.  Op. 38–39.  But I agree with *amicus curiae* Cisco Systems, Inc. ("Cisco"), that, under the best reading of § 482, QCSAs are not subject to the commensurate with income standard.  *See generally* Amicus Curiae Br. Supporting Appellee and Affirmance on Behalf of Cisco Systems, Inc.  As Cisco points out, the commensurate with income standard applies only to a "transfer (or license) of intangible property," 26 U.S.C. § 482, which is distinct from a cost sharing agreement for joint development of intangibles. *See* White Paper, 1988-2 C.B. at 474 (noting that "bona fide research and development cost sharing arrangements" provided a way to "avoid[] section 482 transfer pricing issues related to the licensing or other transfer of intangibles").

QCSAs fall neatly into the latter category.  *See* Treas. Reg. § 1.482-7(a)(1) (2003) (defining a QCSA as "an agreement under which the parties agree to share the costs of development of one or more intangibles in proportion to their shares of reasonably anticipated benefits").  The Commissioner's argument that the commensurate with income standard applies to "intangible transactions in general, and cost sharing arrangements in particular," Appellant's Br. 57, is inconsistent with the plain language of the statute.  Under the only reasonable interpretation of § 482, therefore, the commensurate with income standard does not apply to QCSAs.  For at least this reason, I also disagree with the majority's conclusion that Treasury's reading of § 482 satisfies the second step of the *Chevron* test.  Op. 39–46.